IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
*Southern Division*

| | | |
|---|---|---|
| **JULIA GUTIERREZ et al.,** | * | |
| Plaintiffs, | * | |
| v. | * | Case No.: GJH-18-479 |
| | * | |
| **FIRST NATIONAL BANK OF AMERICA, et al.,** | | |
| | * | |
| Defendants. | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM OPINION

Plaintiffs Julia Gutierrez and Maria Gomez filed an amended class action complaint in the Circuit Court for Montgomery County, Maryland against First National Bank of America ("FNBA"), Cenlar FSB, and Equity Prime Mortgage LLC for violations of the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C.A. § 2605, and the Federal Truth in Lending Act ("TILA"), 15 U.S.C.A. § 1641. Plaintiffs allege that Defendants failed to comply with the notification requirements of these statutes as Plaintiffs' mortgage was transferred between the entities, causing them uncertainty, fear, and worry. Defendants filed separate motions to dismiss for lack of standing and failure to state a claim. ECF Nos. 10, 12, 13. No hearing is necessary. *See* Loc. Rule 105.6. For the reasons stated below, the Court holds that it has no jurisdiction to consider these claims, REMANDS the case to the Circuit Court for Montgomery County, Maryland, and DENIES Defendants' Motion to Dismiss as moot.

## I. BACKGROUND[1]

Plaintiffs refinanced their personal residence with Defendant Equity Prime Mortgage in November 2015. ECF No. 3 ¶ 18.[2] In January 2016, the servicing rights to the loan were transferred to Defendant Cenlar. *Id*. ¶ 19. In February 2016, Plaintiffs received correspondence from Freddie Mac stating that it had acquired their loan. *Id*. ¶ 20. Plaintiffs never received correspondence thereafter that Freddie Mac had sold the loan. *Id*. Cenlar then "reversed" Plaintiffs' November 2016 payment, and also wrongly sent a correspondence to Plaintiffs acknowledging that the loan had been "paid in full." *Id*. ¶¶ 21-22. Plaintiffs were then informed by Defendant Equity Prime, both orally and in a November 9, 2016 letter, that it was their new "temporary servicer," and they should make payments to Equity Prime. *Id*. ¶ 24. Cenlar never sent Plaintiffs any correspondence notifying them that Cenlar was no longer going to service the loan. *Id*. ¶ 23. Nor did Equity Prime's November 9, 2016 letter, or any other correspondence with Plaintiffs, contain the information required by 12 U.S.C.A. 2605(b)(3). *Id*. ¶¶ 24-25. In December 2016, Cenlar once more sent Plaintiffs correspondence stating that the mortgage loan had been paid in full. *Id*. ¶ 26. But in January 2017, Equity Prime sent a statement claiming "the loan was in late."[3] *Id*. ¶ 30. On January 25, 2017, Defendant FNBA notified Plaintiffs their loan was being transferred as of February 2, 2017. *Id*. ¶ 31. On February 3, FNBA informed Plaintiffs that it had purchased Equity Prime's interest in their loan on December 1, 2016. *Id*. ¶ 32.

Plaintiffs explain that the confusion over the status of the loan made them "unsure," "worried," and "fearful." *Id*. ¶ 29. Plaintiffs allege further that Ms. Gomez was hospitalized with

---

[1] Unless otherwise stated, the background facts are taken from Plaintiff's Amended Complaint, ECF No. 3, and are presumed to be true.
[2] Pin cites to documents filed on the Court's electronic filing system (CM/ECF) refer to the page numbers generated by that system.
[3] The Amended Class Action Complaint states that this statement was backdated to January 22, 2018, but the Court will presume Plaintiff meant to say January 22, 2017.

chest pains due to this worry and fear. *Id*. Still, Plaintiffs have made all the required payments to FNBA. *Id*. ¶ 37.

Plaintiffs filed their original complaint in the Circuit Court for Montgomery County, Maryland on December 19, 2017. They filed an Amended Complaint in the same court on January 30, 2018. Defendants filed a notice of removal on February 15, 2018. *See* ECF No. 1. Defendants timely filed separate motions to dismiss. ECF Nos. 10, 12, 13. This Memorandum Opinion and accompanying order address all three motions. No hearing is necessary. *See* Loc. R. 105.6 (Md.). Because the Court holds that Plaintiffs do not have Article III standing, the Court does not have subject-matter jurisdiction and the case will be remanded to the Circuit Court for Montgomery County, Maryland.

## II.     STANDARD OF REVIEW

Though only Defendant FNBA moves to dismiss for lack of standing pursuant to Fed. R. Civ. P. 12(b)(1), jurisdictional standing is nonetheless an issue to be considered by the court in regards to claims against all three parties. *See Dan River, Inc. v. Unitex Ltd.*, 624 F.2d 1216, 1223 (4th Cir. 1980). Standing is a matter of the Court's subject-matter jurisdiction. *See Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 475-76 (1982). It is the plaintiff's burden to prove that subject-matter jurisdictions exists. *See Evans v. B.F. Perkins Co.*, 166 F.3d 642, 647 (4th Cir. 1999). In a facial challenge to subject-matter jurisdiction, a court must determine if the complaint fails to allege facts upon which subject-matter jurisdiction can be based. *See Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009). In such challenges, the plaintiff receives the same procedural protection as under a Rule 12(b)(6) challenge. *Id*. That is, the facts alleged in the complaint are taken as true. *Id*. "In a class action,

we analyze standing based on the allegations of personal injury made by the named plaintiffs." *Beck v. McDonald*, 848 F.3d 262, 269 (4th Cir. 2017).

## III. DISCUSSION

FNBA contends that because Plaintiffs do not allege an injury in fact, they do not have standing and the Court does not have jurisdiction over this claim. Plaintiffs claim that the "botched servicing and mortgage lending practices of the Defendants" caused "unnecessary worry and fear," and that these practices "improperly withheld information deemed material and necessary by Congress." *Id*. ¶ 38. Specifically, Plaintiffs allege that, after receiving correspondence from Cenlar incorrectly stating that the loan had been paid in full, they became "confused and fearful of who actually serviced their loan," who was the owner of the loan, and what was the status of the loan. ECF No. 3 ¶ 26. These fears caused Ms. Gomez to be hospitalized. *Id*. ¶ 29.Thus, Plaintiffs argue they have sufficiently pled an injury in fact and have standing to bring this claim. *Id*. ¶ 63.

Article III of the Constitution limits the jurisdiction of federal courts to "Cases" and "Controversies." U.S. Const. art. III, § 2. To meet this "case or controversy" requirement, plaintiffs must establish that they have standing to sue. *See, e.g.*, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). To establish standing, a defendant "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Trapp v. SunTrust Bank*, 699 F. App'x 144, 145 (4th Cir. 2017) (quoting *Spokeo, Inc. v. Robins*, 136 S.Ct. 154, 1547 (2016)). The first element is the focus of FNBA's motion. An injury in fact is "an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical." *Id*.

Article III "requires a concrete injury even in the context of a statutory violation." *Id*. Here, the alleged injury involves the denial of information required by statute. However, a statutory violation alone does not create a concrete informational injury sufficient to support standing. *Spokeo*, 136 S.Ct. at 1549. "[I]t would be an end-run around the qualifications for constitutional standing if any nebulous frustration resulting from a statutory violation would suffice as an informational injury." *Dreher v. Experian Info. Sols.*, 856 F.3d 337, 346 (4th Cir. 2017). To suffer a concrete informational injury, the plaintiff must suffer, "by being denied access to that information, the type of harm Congress sought to prevent by requiring disclosure." *Trapp*, 699 F. App'x at 145 (emphasis omitted). However, concreteness "is not necessarily synonymous with tangible. Although tangible injuries are perhaps easier to recognize, intangible injuries can nevertheless be concrete." *Dreher*, 856 F.3d at 344 (cleaned up). To determine whether a party has suffered an injury, "courts look to a variety of sources, including whether injuries are of the type that have 'traditionally been regarded as providing a basis for a lawsuit in English or American courts.'" *Id*. at 345 (quoting *Spokeo*, 136 S.Ct. at 1549). Plaintiffs do not propose a common law analogue for the alleged injury here, and the Court finds no traditional right of action that is comparable.

But the lack of a common law analogue is not fatal to Plaintiff's case. *Id*. Violations of statutorily mandated procedures can qualify as concrete injuries when Congress has "conferred the procedural right in order to protect an individual's concrete interests." *Strubel v. Comenity Bank*, 842 F.3d 181, 189 (2d Cir. 2016). Therefore, "in the absence of a connection between a procedural violation and a concrete interest, a bare violation of the former does not manifest injury in fact." *Id*. But where a violation of the procedure may demonstrate a sufficient "risk of real harm" to the protected interest, a plaintiff suffers a concrete injury without "need [to] allege

any *additional* harm beyond the one Congress has identified." *Id*. (quoting *Spokeo*, 136 S.Ct. at 1549) (emphasis in original).

The Second Circuit's decision in *Strubel* is instructive. In *Strubel*, the holder of a credit card brought a putative class action against the bank that issued the card, alleging four violations of TILA. *Id*. at 185-86. Specifically, the plaintiff alleged that the bank failed to notify its customers (1) of a requirement that cardholders wishing to stop payment on an automatic payment plan had to satisfy certain obligations, (2) that the bank was statutorily obliged to advise of any corrections made within 30 days of receiving a billing error claim, (3) that certain rights pertained only to disputed credit card purchases for which full payment had not yet been made, and (4) that consumers dissatisfied with a credit card purchase had to contact the bank in writing or electronically. *Id*.

The court held that the first two of these procedural violations did not demonstrate a risk of real harm to a protected interest. *Id*. at 191-93. First, because the bank did not actually offer an automatic payment plan, the bank's failure to notify cardholders of certain obligations regarding the plan did not risk any real harm to the plaintiff's interest in avoiding the uninformed use of credit. *Id*. at 192. Second, the court held that the bank's failure to notify the plaintiff of its obligations regarding reported billing errors did not create a material risk of harm where plaintiff never had an error to report. In addition, the plaintiff did not "assert that the allegedly flawed notice caused her credit behavior to be different from what it would have been." *Id*. The plaintiff's allegation that the lack of notice could leave a consumer "fretting needlessly" was insufficient to establish an injury because the plaintiff was unable to demonstrate how the lack of notice would, absent an impact on actual behavior, cause a consumer to fret. *Id*. at 193-94. Therefore, the court held that the plaintiff did not establish an injury-in-fact sufficient to have

6

standing to challenge these procedural violations. *Id*. at 194; *see also Dreher*, 856 F.3d at 346 (holding that allegedly incorrect or incomplete information on plaintiff's credit report caused no injury in fact, notwithstanding plaintiff's contention that there was value in "knowing who it is you're dealing with" and in preventing a company from hiding who they are); *Crupar-Weinmann v. Paris Baguette Americ., Inc.*, 861 F.3d 76, 81 (2d Cir. 2017) (increased risk of identity theft alone was insufficient to constitute injury in fact when restaurant violated the Fair and Accurate Credit Transactions Act of 2003 by printing the expiration date of customer's credit card on her receipt).

Conversely, the court in *Strubel* found that the latter two procedural violations demonstrated concrete and particularized injury. 842 F.3d at 190. With regards to requiring notice that certain rights pertained only to disputed credit card purchases not yet paid in full and that a consumer dissatisfied with a credit card purchase must contact the creditor in writing or electronically, the court explained that each served "to protect a consumer's concrete interest in 'avoiding the uninformed use of credit,' a core object of the TILA." *Id*. (quoting 15 U.S.C. § 1601(a)). Both of these requirements imposed obligations onto the consumer herself; therefore, lack of notice of those obligations placed her at a risk of a concrete and particularized harm without the need for any additional preconditions. *Id*. at 191. Specifically, these obligations have a direct relationship to the consumer's choice of how, and whether, to use credit, and therefore the Second Circuit found that the lack of notice of these obligations is a concrete and particularized injury. *Id*; *see also In re Horizon Healthcare Servs. Inc. Data Breach Litigation*, 846 F.3d 625, 634 (3d Cir. 2017) (unauthorized disclosure of plaintiffs' personal information alone was an injury in fact because it was the very injury the Fair Credit Reporting Act was intended to prevent).

Here, Plaintiffs do not properly allege a risk of harm to an interest protected by the statute. Plaintiffs seem to suggest that confusion, fear, and worry flowed from Cenlar's incorrect correspondence stating the loan had been paid in full only because Cenlar had failed to give notice of the transfer of the loan back to Equity Prime as required by 12 U.S.C.A. § 2605(b). A generalized confusion, fear, and worry are not the injuries Congress sought to protect by passing RESPA or TILA. *See* 12 U.S.C.A. § 2601; 15 U.S.C.A. § 1601. After Congress found that reforms were needed to protect consumers "from unnecessarily high settlement charges caused by certain abuse practices," 12 U.S.C.A. § 2601(a), it passed RESPA to result:

> (1) in more effective advance disclosure to home buyers and sellers of settlement costs;
> (2) in the elimination of kickbacks or referral fees that tend to increase unnecessarily the costs of certain settlement services;
> (3) in a reduction in the amounts home buyers are required to place in escrow accounts established to insure the payment of real estate taxes and insurance; and
> (4) in significant reform and modernization of local recordkeeping of land title information.

*Id*. § 2601(b). None of these purposes bare the slightest resemblance to Plaintiffs' claimed injuries.

Plaintiffs fare no better under TILA. There, Congress found that "economic stabilization would be enhanced and the competition among the various financial institutions and other firms engaged in the extension of consumer credit would be strengthened by the informed use of credit." 15 U.S.C.A. § 1601(a). Therefore, Congress sought to "assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit, and to protect the consumer against inaccurate and unfair credit billing and credit card practices." *Id*.

Plaintiffs do not allege that FNBA's failure to notify them kept them from comparing various credit terms or impacted their decision-making in any way. *See, e.g. Dreher*, 856 F.3d at

347 (recognizing that plaintiff was not injured when incorrect information did not adversely affect his conduct in any way). Nor do they allege they were unable to make an informed decision about their use of credit. They do not offer evidence of "unfair credit billing and credit card practices" on the part of FNBA. And the only allegation in the complaint even indirectly related to inaccurate billing practices—that Plaintiffs were incorrectly informed that their loan had been paid off—is alleged to be the fault of Cenlar, against which Plaintiffs only allege violations of RESPA, not TILA.

TILA is designed to protect consumers from harm relating to the use of credit. Where consumers allege injury, or a significant risk of injury, relating to that interest, they meet Article III's injury-in-fact requirement. But where, as here, plaintiffs can offer no real harm beyond "nebulous frustration," Article III's requirements are not met. *Dreher,* 856 F.3d at 346. Indeed, for this reason a number of courts reviewing TILA claims similar to this one have dismissed the claim for lack of standing. *See Strubel*, 842 F.3d at 190 (bare procedural violation of TILA did not cause an injury in fact); *Cottle v. Monitech*, 2017 WL 6519024 at *1-3 (E.D.N.C. 2017) (defendant's failure to comply with TILA by segregating certain disclosures and providing a lease substantially similar to the model form nonetheless caused no injury in fact); *Jamison v. Bank of Amer., N.A.*, 194 F. Supp. 3d 1022, 1028 (E.D. Cal. 2016) (a bare procedural violation of TILA does not establish any harm suffered as a result of defendant's actions).

While Plaintiffs' claimed injury involves worry and confusion about who owned their loan, they continually made payments on the loan without interruption, *see* ECF No. 3 ¶ 37, or risk of added costs or fees, and have alleged no impact on their credit decisions. Thus, there was no risk of harm to an interest protected by RESPA or TILA. Because Plaintiffs have not pled an injury in fact, they do not have standing pursuant to Article III.

## IV. CONCLUSION

Because this case was removed from state court, 28 U.S.C. § 1447 governs post-removal procedure. That statute reads in part, "If at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded." *Id*; *see also Page v. Tri-City Healthcare Dist.*, 861 F. Supp. 2d 1154, 1171-73 (S.D. Cal. 2012) ("Where a plaintiff in a removed action lacks federal standing to sue, the action should generally be remanded, not dismissed."). The Fourth Circuit makes no exception to this rule. *See Roach v. W. Va. Reg'l Jail & Corr. Facility Auth.*, 74 F.3d 46, 48-49 (4th Cir. 1996) ("The plain language of § 1447(c) gives 'no discretion to dismiss rather than remand an action' removed from state court over which the court lacks subject-matter jurisdiction.") (quoting *Int'l Primate Protection League v. Adm'rs of Tulane Educ. Fund*, 500 U.S. 71, 79 (1991)). Finding Plaintiffs have no standing to sue in federal court, the Court remands the case to the Circuit Court for Montgomery County, Maryland. A separate Order shall issue.

Date: <u>September  21, 2018</u>                     <u>        /s/                            </u>
GEORGE J. HAZEL
United States District Judge